IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

BRENDA SMITH,

      Plaintiff,

vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

      Defendant.

3:16-cv-104-JAJ-HCA

REPORT AND RECOMMENDATION
(FILED UNDER SEAL)

Plaintiff Brenda Smith  seeks review of the Social Security Commissioner's decision denying her application for disability benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-434.  This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The case is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The matter is fully submitted on the briefs.

## I.      PROCEDURAL AND FACTUAL BACKGROUND

On October 25, 2013, Ms. Smith protectively filed an application for disability benefits alleging an onset date of September 25, 2013. (AR at 30, 359-365). The Social Security Administration ("SSA") denied her claim initially and again on reconsideration on June 4, 2014. (*Id.* at 301-302). Ms. Smith requested a hearing (*id.* at 303-304), which was granted (*id.* at 305-306). Administrative Law Judge ("ALJ") Donald E. Garrison held a hearing on September 24,

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

2015, in Franklin, Tennessee. (*Id.* at 46-79). Ms. Smith appeared with attorney Theresa Martin; vocational expert Chelsea Brown also attended and testified. On October 28, 2015, the ALJ issued an unfavorable decision, finding Ms. Smith was not disabled. (*Id.* at 27-38). Ms. Smith requested a review of the ALJ's decision. (*Id.* at 25). The Appeals Council denied the request for review and the ALJ's decision became a final decision on September 10, 2016. (*Id.* at 1-4). Ms. Smith timely filed her Complaint [1] in this case on November 4, 2016.

### A.  Educational and Vocational Factors

Ms. Smith was 44 years old when she filed for benefits. (AR at 359). She had past work as CNA/home health aide, operator-laborer (excavation business), guest service agent in a casino, packer-assembler, waitress, production worker, and housekeeper in a hotel. (*Id.* at 395). She was a high school graduate and could read and write. (*Id.* at 52)

### B.  Medical Evidence

#### 1.  Medical Records

Ms. Smith claimed she was disabled by lumbar degenerative disc disease, chronic obstructive pulmonary disease (COPD), coronary artery disease (CAD), major depressive disorder and panic disorder. The records on the medical conditions before the ALJ were sparse, covering treatment primarily from November 6, 2013, to August 31, 2015. There are some records for medical services between October 15, 2007, and October 3, 2009 (AR 572-587), but they are not relevant to Ms. Smith's claims here.  Counsel submitted additional records to the Appeals Council which covered services from March 17, 2005, to approximately December 2, 2008 (AR 81-266); however, those records (although referenced below) were not provided to the ALJ.

In response to Ms. Smith's complaint of low back pain, an MRI of her lumbar spine was performed on March 17, 2005. (AR at 83). The radiologist found mild lumbar levoscoliosis at L3

and mild degenerative disc disease at L3-4 and L5-S1, with left lateral disc protrusion at L3-4 causing mild left neural foraminal stenosis. (*Id.*) There was also a central–right paracentral annular tear at L5-S1 with associated mild focal central disc protrusion and mild narrowing of the right lateral recess with no significant central canal stenosis. (*Id.*)

On June 2, 2005, Ms. Smith was seen at a pain clinic at Crockett Hospital where it appears she had been treating for her complaints of lower back and left leg pain. (AR at 85). Nursing notes indicate she had received nerve blocks and trigger points through physical therapy, which decreased her pain by 50%. (*Id.*) Another note states an (undated) MRI of the lumbar spine showed a new herniated disc but she would need a repeat neurosurgical evaluation before the clinic would proceed with more blocks. (*Id.*)

Between July 24, 2006, and March 6, 2007, Ms. Smith was treated at the Pain Center of Columbia where she received trigger point injections on two occasions initially (AR at 238, 240), but thereafter only reported for refills of medications (Percocet and Zanaflex) until her insurance ran out in March 2007 and she moved to Iowa. (*Id.* at 206, 211-12, 215-16, 219-20, 223, 226, 228-29, 233, 238, 240).  Only two trigger point injections were attempted as Ms. Smith reported they were not helping relieve her pain. (*Id.* at 229, 233).

On September 4, 2007, Ms. Smith was seen by a physician's assistant at Great River Spine with a complaint of low back pain and numbness and tingling in her left thigh region, ongoing for the last four years. (AR at 146).  She was taking Oxycodone at that time to relieve her pain symptoms and reported having past epidural injections which did not provide relief. (*Id.*) She had not done physical therapy. A lumbar MRI was reviewed which showed degenerative disc disease at L5-S1, as well as L3-4 level, and a broad based disc bulge at the L5-S1 level without any central canal or foraminal stenosis. (*Id.*) On physical examination, her cervical spine and lumbar spine

range of motion were both grossly normal. (*Id.*) Physical therapy was prescribed and scheduled and she was to follow-up after physical therapy was completed. (*Id.* at 147).  At a follow-up visit on October 2, 2007, Dr. Robert Foster opined that based on her symptomatology and problems, surgery was not likely to benefit her. (*Id.* at 148). He released her back to the care of the Pain Clinic, noting he would see her in follow-up if her symptoms persisted and the pain physicians indicated otherwise. (*Id.*)

Ms. Smith had a chest x-ray at Great River Medical Center in Burlington, Iowa on October 2, 2007. (AR at 183). The radiologist read the x-ray as showing normal heart size and pulmonary vascularity with clear lungs. (*Id.*) His impression was no acute cardiopulmonary disease. (*Id.*)

On October 12, 2008, Ms. Smith was admitted to Great River Medical Center with a complaint of gastric ulcer. (AR at 189). She had had abnormal EKG's and Dr. Mark Woodard was asked to evaluate. (*Id.*) A CAT scan of her chest on October 13, 2008, showed granulomatous calcifications within the thorax, mild bibasilar atelectasis, no evidence of coronary artery or pericardial calcifications and scarring the apices bilaterally. (*Id.* at 198). An echocardiogram the same date showed moderate global hypokinesis of LV contractility, mild-moderate impairment of LV systolic function with an ejection fraction between 40-45%, restrictive LV filling patter consistent with elevated LA pressure, normal left atrium and aortic valve, thickened mitral valve with nodular degeneration, and the pericardium appeared to be thickened with some calcification. (*Id.* at 195). On December 1, 2008, a heart SPECT Perfusion study was performed in which no stress-induced reversible ischemic changes were identified. (*Id.* at 193). The reviewing physician noted mild fixed perfusion defect involving the distal anterior septal left ventral wall and apical regions and mild fixed perfusion defect involving the mid and proximal inferoseptal left ventricular wall. (*Id.*) A cardiac stress test on December 2, 2008, was terminated at Stage 3 when Ms. Smith

4

met her target heart rate/was fatigued. (*Id.* at 200). The test was interpreted to be indeterminate with left bundle branch block. (*Id.*) Ms. Smith had no chest pain and no arrhythmias during the test. (*Id.*) At a follow-up visit on January 5, 2009, a repeat treadmill was ordered to be done in six months. (*Id.* at 188).

Dr. Gary McBride completed an "All Systems Examination" on January 9, 2014, when he saw Ms. Smith at the request of the state agency. (AR at 450-458). Dr. McBride was to assess her claims of back pain, anxiety, depression, heart problems and arthritis in her hands. (*Id.* at 450). With respect to her complaint of back pain, Ms. Smith told Dr. McBride she began having low back pain in 2003 without injury and had been diagnosed as having "DDD, arthritis, scoliosis, bulging and herniated disks, and osteoporosis by bone density." (*Id.*) The pain was constant, "radiating into her buttocks, legs and feet with numbness in her buttocks and legs." (*Id.*) Her neck pain did not radiate. Changing position made the condition better and walking and standing worsened it. (*Id.*) With respect to her heart problems, Ms. Smith told Dr. McBride that when she was hospitalized for bleeding ulcers a few years before she was told she had signs of past MI or CVA which caused a thickening in the left wall of her heart. (*Id.*)  She reported occasional chest pain, tachycardia and shortness of breath, which were made better by rest and worsened by housework, walking and stress. (*Id.*) She last saw a cardiologist in 2008 and her primary care physician in 2011. (*Id.*) She complained of chest pain three to four times a week with radiation into her right arm, "associated with dizziness, tachycardia, dyspnea, shortness of breath, and headache," occurring with exertion and stress. (*Id.*) The pain resolved after resting 30-60 minutes or on its own. (*Id.*) Ms. Smith complained of worsening pain, stiffness and swelling in both hands but had not seen a physician. (*Id.* at 451). Ms. Smith was a pack-a-day cigarette smoker for 26 years and denied use of alcohol or illegal drugs. (*Id.* at 452). On physical examination Dr. McBride

found Ms. Smith to be "[w]ell developed and thin; alert and oriented x3; and in no apparent distress." (*Id.* at 452). Her intellectual functioning appeared normal. As relevant to her complaints, her neck was "[s]upple without jugular venous distension, thyromegaly, bruits, or lymphadenopathy," her heart had a "[r]egular rhythm without murmurs, gallops, or rubs" and no signs of vascular congestion." (*Id.* at 453). Her lungs were clear with no rales, wheezes, or rhonchi. (*Id.*) Her musculoskeletal strength was 5/5 in all major muscle groups and range of motion in normal ranges and limitations. There was "no tenderness, redness, swelling, spasm, joint enlargements, or muscle wasting in any joint examined." (*Id.*) Ms. Smith's grip strength was evaluated: her ability to grasp and manipulate objects was abnormal bilaterally as she complained of pain and stiffness. (*Id.*) Her ability to lift a 10-pound weight while seated was abnormal bilaterally based on a complaint of low back pain. (*Id.*) Her station was normal and gait antalgic based on low back pain. She did not use an assistive device to ambulate and her mobility was normal, getting out of the chair and on and off the examining table without difficulty. (*Id.*) A lumbosacral x-ray was taken which showed no acute osseous abnormalities and mild degenerative disc disease at L3-4. (*Id.* at 458). Her straight leg raising tests were negative bilaterally, as were Tinel's Signs and Phalen's Signs. Dr. McBride diagnosed Ms. Smith with low back pain and nicotine dependency per her patient history. (*Id.* at 455). Based on these findings, Dr. McBride assessed Ms. Smith could lift and carry up to 10 pounds frequently and 20 pounds occasionally in an eight-hour day; sit, stand or walk frequently in an eight-hour day (up to two and a half to five hours); and frequently reach, stoop, kneel, and climb stairs. Her only restriction in all these activities was her low back pain. (*Id.* at 456). Dr. McBride recommended psychiatric evaluation for her allegations of depression and anxiety. (*Id.* at 457).

On September 15, 2014, Ms. Smith presented at Lifespan Health complaining of back pain which started eight years before and was worsening. (AR at 811). At that time she was taking Trazadone and Hydroxyzine at bedtime, Effexor and Clonazepam. (*Id.* at 812-13).  She also reported chest pain and dyspnea on exertion. (*Id.*at 813). On physical examination her lumbar spine was tender and there was mild pain with motion. (*Id.* at 814). Her gait was normal. (*Id.*) Her back pain was diagnosed as sciatica and she was given a prescription for Prednisone and Robaxin with directions to follow up in two weeks. (*Id.* at 816). With respect to her chest pain labs were drawn and an EKG was to be performed. (*Id.*) Finally, with respect to her complaint of dyspnea on exertion, spirometry evaluation was ordered and she was counseled on quitting smoking. (*Id.*)

On September 16, 2014, Ms. Smith reported to the Emergency Department at Maury Regional Health complaining of chest pain and possible ACS. (AR at 747). An EKG showed normal sinus rhythm with right atrial enlargement, anteroseptal infarct (age undetermined), and ST & T wave abnormality, consider inferior ischemia. (*Id.* at 755). The clinical impression was "fatigue" and Ms. Smith was discharged to home in stable condition. (*Id.* at 746).

At the direction of Dr. Christina Free at Lifespan, Ms. Smith had an x-ray of her lumbar spine on October 27, 2014. (AR at 639). The x-ray showed no acute findings and mild degenerative disc disease within the lumbar spine. (*Id.*)

On January 2, 2015, Ms. Smith had an MRI of her lumbar spine and echocardiogram. (AR at 635-638). The MRI showed degenerative disc disease at L3-4 and at L5-S1 "with focal disc herniation at the latter level resulting in moderate lateral recess stenosis bilaterally with mass effect upon the descending S1 nerve roots" and "[m]ild mid lumbar levoscoliosis." (*Id.* at 636). The echocardiogram showed "normal size left atrium and left ventricle" and normal thickness of the left ventricular wall. There was "diffuse left ventricular hypokinesia which [was] more pronounced

7

at the anterior wall, intraventricular septum and apex." (*Id.* at 638). "The inferior wall and inferolateral left ventricular wall motion [was] relatively better preserved" and times when "septal motion appears paradoxical." The left ventricular ejection fraction was 30-35%. These findings suggested "coronary artery disease with moderate to significant left ventricular systolic dysfunction." (*Id.*) There was mild mitral regurgitation and reduced left ventricular diastolic compliance. (*Id.*) The examining physician, Dr. Bharat Singh, suggested a left heart catheterization and office follow-up but Ms. Smith "seemed reluctant." (*Id.*) Dr. Singh conducted a SPECT scan on Ms. Smith's heart on January 5, 2015, which revealed "mild to moderate small size reversible perfusion defect involving the apical inferior left ventricular wall suggestive of ischemia," "diffuse left ventricular hypokinesia" "with overall left ventricular ejection fraction of 29%: suggestive of ischemic cardiomyopathy and moderate to severe LV systolic dysfunction." (*Id.* at 590). Her resting ECG showed normal sinus rhythm with left bundle branch block. (*Id.*)

A medical source statement on Physical Capacities Evaluation from K. Brown, FNP-C, was provided on January 19, 2015. Ms. Brown indicated on the form that Ms. Smith was capable of sedentary work, could sit four hours, stand three hours and walk one hour in an eight-hour work day, left a maximum of ten pounds; occasionally lift a maximum of ten pounds; frequently lift less than ten pounds; push and/or pull on an unlimited basis; never climb, occasionally balance, rarely stoop, kneel or crouch, and never crawl; could reach occasionally and frequently grasp, feel, see and hear; should not work in extreme heat or cold. Ms. Brown gave the opinion Ms. Smith's impairment would last at least twelve months but noted she had only seen the patient on one occasion. (Tr. at 547-548).

Dr. Andrew Zurick saw Ms. Smith on February 5, 2015 for consultation on her coronary artery disease. (AR at 549-553). After a history and physical and assessment of her EKG, he

assessed her as having chronic systolic heart failure based on a left ventricular ejection fraction of 30-35%, cardiomyopathy, and left bundle branch block. (*Id.* at 552). Dr. Zurick recommended she initiate therapy and cardiac catheterization, but there are no records this occurred or the medical records are undecipherable. (*Id.* at 552-569).

On August 26, 2015, Dr. Jon Turnen saw Ms. Smith for pulmonary evaluation. (AR at 732). On physical examination Ms. Smith was not short of breath and her respiratory exam was clear to auscultation. Dr. Turnen assessed dyspnea based on pulmonary function testing which revealed "mild area traction without bronchodilator response." (*Id.* at 733). Her FEV1 was "2.43 L 77% predicted with a ratio of 75%." (*Id.*) Dr. Turnen thought she might have "obstructive lung disease in the setting of physical deconditioning and chronic myopathy." (*Id.*) She needed a chest x-ray. Dr. Turnen started Ms. Smith on a bronchodilator and steroid once a day for 30 days. (*Id.*)

        2.     Mental Health Records

Ms. Smith referred herself to Centerstone Community Mental Health on November 13, 2013, for help with "depression, anxiety and disability." (AR at 444). Robert Johannes, LADAC, prepared an Intake Assessment based on his meeting with Ms. Smith. He believed her "affective and behavioral presentation" was consistent with a diagnosis of Major Depressive Disorder, Recurrent, Unspecified, and anxiety disorder.  (*Id.*)  Ms. Smith's goal for treatment was "I don't want to cry, don't want to feel nervous and get some sleep." (*Id.*)  Mr. Johannes believed Ms. Smith's willingness to participate in treatment and lack of substance abuse issues could be helpful in "achieving a positive outcome;" negative factors impacting outcome were the possibility she might go to jail because not paying child support and waiting on disability determination. (*Id.*) Ms. Smith agreed to participate in a psych/med evaluation for appropriate medications and medication

management, individual therapy for coping skills on a bi-monthly basis, and was willing to participate in a case management assessment in the future if required. (*Id.*)

On December 3, 2013, Ms. Smith met with Doris Chapman, RN, BSN, MSN, at Centerstone Health for the psych/med evaluation. (AR at 528). She had moved to Tennessee from Iowa to be near her children and grandchildren. Ms. Smith reported a treatment history over the last seventeen years on most medications, which were not effective or made her worse. (*Id.*) She had not had any hospital stays and denied any current suicidal ideation. (*Id.*) On mental status exam her appearance was casual, mood depressed, and affect blunted. (*Id.* at 530). Her thought process was organized/logical, insight fair, and judgment moderately impaired. She had average intelligence. (*Id.*) Ms. Chapman diagnosed Ms. Smith with bipolar disorder and anxiety disorder with a current GAF of 50. (*Id.* at 531). Ms. Chapman prescribed a trial of Seroquel XR for mood/sleep/anxiety and Ms. Smith was to return in two weeks to continue therapy. (*Id.*)

Ms. Smith returned to Centerstone on December 10, 2013, and asked to see Ms. Chapman after a therapy session. (AR at 521). She was very agitated and reported she could not tolerate the Seroquel XR and only took it for four nights. (*Id.*) Ms. Smith was willing to try Pristiq, asked for a sleep aid and was willing to try Ambien and would try some Xanax PRN. (*Id.*) Ms. Smith's mood was angry and her affect blunted. (*Id.*) During the therapy session therapist Robert Johannes focused Ms. Smith on exploring the sources of her depression. (*Id.* at 526). Ms. Smith was anxious about her SSI paperwork and reported a pain level of eight in her lower back, which was affecting her sleep. She had to sit on a heating pad. She reported having heart palpitations. (*Id.*) Ms. Smith worked on releasing her feelings of anxiety, anger, etc. through other methods to decrease anxiety and stress. (*Id.*)

Ms. Smith returned to Centerstone on January 7, 2014, for therapy. (AR at 513). Her mood was euthymic and affect appropriate. (*Id.* at 516). Ms. Smith reported her depression started six years before when she moved to Michigan, her teenage children got out of control, and she lost her job. (*Id.* at 513). Upon returning to Tennessee, things were stolen from her, she had to deal with homelessness, and was staying with an aunt. (*Id.*) She had to pay child support, but did not have resources to make the payments. (*Id.*) She was trying to get disability and said she could not hold a job. (*Id.*) She was dealing with lower back pain, rating it at seven or eight out of ten and could walk but not sit or stand for long with the pain. (*Id.*) She said she had difficulty concentrating and would not be able to follow directions on a daily basis. (*Id.*) As before, Ms. Smith worked on releasing her feelings of anxiety, anger, etc. through other methods to decrease anxiety and stress. (*Id.*)

At a visit on February 4, 2014, Ms. Smith was tearful during the session as her boyfriend had been killed in an automobile accident the week before. (AR at 508). She complained about her kids and her extended family. (*Id.*) The goal of this session was to work on handling the stages of grief. (*Id.*)

On February 10, 2014, Ms. Smith met with Melissa Greer, a licensed senior psychological examiner, and Dr. Scott Beebe, licensed psychologist, for a psychological evaluation in connection with her application for disability benefits. (AR at 460-464).  Ms. Smith was appropriately dressed for the evaluation and her hygiene and grooming were good. The examiners observed a mild limp which slowed her gait. (*Id.* at 460). Ms. Smith reported having suffered from symptoms of depression on a daily basis the last seventeen years. (*Id.* at 461). She reported difficulty falling asleep and staying asleep for twenty years, and "unprovoked crying spells" one or twice a week while on medication. (*Id.*) She was receiving outpatient treatment at Centerstone and had received

outpatient treatment in Iowa in the past. (*Id.*) Ms. Smith was unemployed at the time, with her last employment for Praxis (for three months) ending in 2013 because "she couldn't keep up." (*Id.*) Ms. Smith did not need help with personal care. (*Id.* at 461-462). On a typical day she watched TV or played on the computer. She did not read and had no hobbies. (*Id.* at 462). Ms. Smith did not socialize "a lot" and was not involved in community activities. (*Id.*) She did some yard work, sometimes with a push mower, did all household chores but took her time, had a driver's license, and did drive. (*Id.*) She reported having "no difficulty remembering verbal instructions and comprehending written instructions," could count change and use a check book, and make financial decisions. (*Id.*) On a bad day Ms. Smith said she would stay in her room and sleep, maybe once or twice a month. (*Id.*) She told the examiners she used to be outgoing and had friends. (*Id.*) On mental status exam, Ms. Smith's energy level was typical, she was alert and oriented x4 with adequate eye contact, good level of spontaneity, and good articulation at a typical rate of speech. (*Id.*) Ms. Greer and Dr. Beebe assessed her ability to do work related activities as follows: she was mildly limited in her ability to understand and remember; mildly limited in her ability to sustain concentration and persistence; mildly to moderately limited in her social interaction; and mildly limited in adaptation, all based on her anxiety and depression. (*Id.* at 463-464). They believed Ms. Smith presented credibly, had short-term memory impairment with adequate long-term memory and typical concentration, appeared to function intellectually in the low average range, her mood was mildly dysphoric and Ms. Smith demonstrated moderate to mild anxiety. (*Id.* at 464). Their final diagnosis was major depressive disorder, recurrent, mild, chronic and panic disorder. (*Id.*)

By March 4, 2014, Mr. Johannes noted slight improvement in Ms. Smith's grief and worked with her to learn to use non-threatening statements and to express herself in ways that would not upset others. (AR at 498). Ms. Smith's medications were switched from Xanax to Klonopin. (*Id.*

at 500). At a visit on March 21, 2014, Ms. Smith expressed suicidal thinking. (*Id.* at 495). Mr. Johannes made a referral to the mobile crisis unit and Ms. Smith was transported to the regional health center emergency room by city police. (*Id.*)   There her condition was assessed and Ms. Smith was transported by the sheriff's department to Western Mental Health Institute ("WMHI") for further evaluation. (*Id.* at 774, 778).

On admission at WMHI Ms. Smith was not in acute distress and was underweight. (AR at 607). She was cooperative, alert and oriented, and her attention/concentration, immediate recall and remote memory were intact. (*Id.*) Her affect was sad and her mood sad and depressed with no disturbance of thought processes. (*Id.*) Ms. Smith had suicidal ideation and a plan, was awareness of her illness, and had fair judgment. (*Id.*) Dr. Jeffrey Robbins, the staff psychiatrist, believed Ms. Smith's prognosis was good as she did not have a substance abuse history, adhered to treatment, and had no cognitive decline. (*Id.* at 608). While she was hospitalized Ms. Smith attended psychoeducation, group therapy and individual therapy, where she met goals by showing improved ability to "discuss symptoms and side effected and increased knowledge of illness and medication, improved ability to identify stressors and improved ability to identify early warning signs of relapse." (*Id.*) Dr. Robbins listed as a factor contributing to Ms. Smith's hospital admission her "lack of psychosocial support." (*Id.*) During her hospitalization, Dr. Robbins noted Ms. Smith made positive use of free time, enjoyed leisure activities, had good grooming/hygiene skills, could perform activities of daily living, exhibited independent living and money management skills, was willing to participate in treatment and had a history of participating in outpatient care, had past success in the community and a stable living situation, placement was available, and she had family support. (*Id.* at 609).  Ms. Smith was discharged to independent living with her family on March

28, 2014, as she no longer posed an imminent risk of self-harm. (*Id.*)  Her discharge medications included Effexor XR, Lithium Carbonate and Trazodone. (*Id.* at 608).

On March 28, 2014, Ms. Smith reported to the emergency room at the regional health center complaining of tremors to her entire body after the WMHI doctor stopped all her medications and started new medications. (AR at 758). She was given a prescription for Hydroxyzine HCl for insomnia and counseled on medication use. (*Id.* at 765).

Ms. Smith followed up at Centerstone on April 1, 2014, complaining about her new medications. (AR at 487). She wanted to stop the prescription for Lithium and continue her other medications. The psychotherapist, Rosemary Scott, stopped the prescription for Lithium but continued the other medications. (*Id.* at 491).  During individual counseling with Mr. Johannes, Ms. Smith declined to sign up for suicide pathway and reported a poor relationship with the aunts with whom she was staying and who were transporting her to therapy. (*Id.* at 492). Mr. Johannes outlined as obstacles to progress Ms. Smith's limited resources, limited support, and her poor relationship with her current care givers. He planned to provide supportive motivational counseling. (*Id.*)

On April 29, 2014, Ms. Smith reported to Ms. Scott that she was having sleep issues. Ms. Scott increased the dosage of Trazadone and continued all other medications. (AR at 478). Mr. Johannes noted some improvements in Ms. Smith's attachments of objectives related to exploring her sources of depression, developing understanding of negative cognitive self-talk, and exploring grief which may contribute to depression. (*Id.* at 483). They were continuing "to work on CBT and cognitive restructuring to keep depressed emotions out of her daily functioning." (*Id.*)

On May 27, 2014, Ms. Scott continued Ms. Smith's medications after Ms. Smith reported she was sleeping better, in spite of continued conflict at home. (AR at 471). Mr. Johannes noted

slight improvement in Ms. Smith's goal of alleviating her mood symptoms and returning to her previous level of effective functioning, as well as slight improvement in the objective of understanding her negative cognitive self-talk and automatic thoughts. Ms. Smith was angry about her adult children's drug usage and had asked them to leave, and was arguing with an aunt who was moving away. (*Id.* at 469). They used CBT to have Ms. Smith look at her perceptions and determine a pattern of thinking that would be more productive. (*Id.*)

Ms. Smith did not show up for a scheduled appointment on June 24, 2014. (AR at 678). On July 22, 2014, she met with Ms. Scott for medication check and reported her medications were working well. (*Id.* at 674). She met with Mr. Johannes for therapy and was observed to be "slightly agitated, irritable and dysthymic." (*Id.* at 672). She was trying to get on TN CARE as she did not have insurance, was "staying around the house," had no income and was dependent on her aunt, and reported increased anxiety and depression. (*Id.*) Mr. Johanes used CBT to have Ms. Smith identify her problems and reframe her thinking. Ms. Smith reported some progress and felt better. (*Id.*) On July 31, 2014, Ms. Smith again did not show up for a scheduled appointment. (*Id.* at 671).

On August 19, 2014, Ms. Smith met with Mr. Johannes for therapy. (AR at 668). She was depressed and angry, reporting her father was dying in a nursing home, and she wanted to call him to forgive him "for not being in her life," needing closure on these issues. (*Id.*)  Mr. Johannes used RET and grief therapy to assist Ms. Smith "in developing some insight and awareness into her moods." He planned to provide "supportive motivational counseling and problem solving techniques." (*Id.*)

At a visit with Mr. Johannes on September 22, 2014, Ms. Smith reported needing help with TN Care, presented with "dysthymic affect, stressed, frustrated and angry." (AR at 665). She reported she possibly had cervical cancer and needed medical attention for lower back problems.

(*Id.*) Johannes used problem solving techniques to help and referred her to the health department at Hope Clinic and Lifespan. (*Id.*) On October 2, 2014, Ms. Smith called Mr. Johannes, reporting she needed a hysterectomy after being diagnosed with cervical cancer and HPV but had no income, no transportation, and a limited support system. Mr. Johannes encouraged her to go to DHS for help and would request CM services. (*Id.* at 664).

Ms. Smith was seen by Ms. Scott on October 14, 2014, for medication check. (AR at 658). Ms. Smith reported she was doing "pretty good," was sleeping and eating fine. She wanted to continue her meds as her mood levels, depression, and anxiety were fairly well controlled. (*Id.*) She told Mr. Johannes at her therapy session that same date that she had increased depressive symptoms but had just received news she did not have cervical cancer, only HPV. (*Id.* at 654). Mr. Johannes used RET to try to get Ms. Smith "to be more mindful of her symptoms and look at being positive that she was healthier than she thinks she is." (*Id.*)

On October 11, 2014, Mr. Johannes met with Ms. Smith, observing her to be disheveled in appearance, sad, and irritable with disorganized thought. (AR at 652). She was tearful during the session about not having any income and the possibility of going to jail for failing to pay child support. (*Id.* at 651). They worked with CBT to help Ms. Smith find positives in her life and Mr. Johannes explored whether Ms. Smith was having any suicidal ideation, which she denied. (*Id.*) Ms. Smith met with her case manager Miranda Kerr the same day to discuss her status on insurance and her ongoing physical health problems. (*Id.* at 649).

Ms. Smith did not show up for an appointment with Mr. Johannes on December 16, 2014. (AR at 646). She did have a home visit with Ms. Kerr on that date, who helped her with paperwork for financial assistance from a church for Ms. Smith's medical exams and prescription assistance. (*Id.* at 644). Ms. Smith had fired her disability lawyer and was to pay child support. (*Id.*) She lost

her driver's license for failing to pay child support and was required to provide documentation proving she could not work, but could not produce the documents at that time. (*Id.*) Ms. Smith was not happy with the results of medical tests and wanted a second opinion. She was going to see a new doctor who would work with her disability. (*Id.*)

On January 6, 2015, Ms. Smith saw Ms. Scott for a medications check. (AR at 728). She reported she found out she had a weak heart and had "lots of test [sic] last week." Ms. Smith said her medications were working fine but she was worried about her health and feeling weak. (*Id.*) At a therapy session with Mr. Johannes the same date, Ms. Smith presented "with irritable affect" and anger and tearfulness arising from her relationship with her aunt, her medical concerns, and a perception her medical providers were not helping. (*Id.* at 725). She reported she was told she had a weak heart after a stress test and should take nitroglycerin but was not given a prescription. (*Id.*) Ms. Smith reported increasing memory problems. Mr. Johannes allowed Ms. Smith to vent regarding her stressors and worked on problem solving and relaxation. (*Id.*) A January 12, 2015, Progress Note by case manager Kerr indicated Ms. Smith was "frusterated [sic] and stressed by health condintions [sic] and lack of insurance." (*Id.* at 727). Ms. Kerr assisted in getting medical records transferred. (*Id.*)

In a March 16, 2015, Progress Note by case manager Kerr, Ms. Smith was staying with her mother in Iowa, their relationship having improved. (AR at 718). Ms. Smith reported as stressors that tests showed her heart was "functioning at 35 percent with no blockages," she had a child support hearing coming up, and she was "suffering from bulging disc and fatigue." (*Id.*) Ms. Kerr noted Ms. Smith seemed to be stable and her moods improving. (*Id.*) A subsequent Progress Note on March 30, 2015, indicated Ms. Smith was staying in Iowa with her mother and conditions were "about the same." (*Id.* at 717). Ms. Smith cancelled appointments with Ms. Scott, Mr. Johannes

and Ms. Kerr on March 26, 2015, and March 31, 2015, respectively, as she was still out of town and Ms. Kerr closed case management at that time. (*Id.* at 713-716).

On March 31, 2015, Mr. Johannes and Ms. Kerr updated Ms. Smith's Care Plan. (AR at 691-694). Ms. Smith signed the Care Plan on April 21, 2015. (*Id.* at 694). Ms. Kerr noted that with respect to Ms. Smith's goals, she had applied for disability and had been attending doctors' appointments. She had a court date for her back child support problems. (*Id.* at 691). With respect to her mental health symptoms and case management needs, Ms. Smith had improved her relationship with her mother, had some anger and anxiety concerning her health and treatments, and lacked adequate income. (*Id.*) Case management was being closed because Ms. Smith was staying in Iowa while her mother had knee surgery. Ms. Smith reported no anxiety/depression issues at that time. (*Id.* at 692).

Ms. Smith returned to see Ms. Scott on April 21, 2015, reporting her medications were working "good," she was having heart problems and staying in Iowa with her mom. (AR at 709). She saw Mr. Johannes on this visit and reported her heart and disc problems. They discussed her upcoming disability hearing and other court proceedings and worked on verbalizing positive outcomes. (*Id.* at 707).

Ms. Smith returned to Tennessee on July 21, 2015, and saw Ms. Scott for a medication check. (AR at 699). She indicated her anxiety was well controlled, her moods were level and she suffered no depression, although some stress. She was still living in Iowa with her mother and might move there full-time. (*Id.*) During her therapy meeting with Mr. Johannes, he noted she appeared disheveled but cooperative, her affect was worrisome and mood anxious, and her thought logical. (*Id.* at 698). He observed "mild dysthymia, irritability" and she expressed she needed to vent about her medical issues. (*Id.* at 697). She was frustrated with doctors who would not sign

disability forms about her heart and stated she had an appointment with a lung doctor to get a statement about her COPD. (*Id.*) Her current stress issues were back pain, losing her license and financial problems. (*Id.*) Mr. Johannes used CBT to help direct Ms. Smith in positive thinking, to "attend her medical appointments and follow through with therapeutic advice." (*Id.*)

### C.      Hearing Testimony

At the hearing on September 24, 2015, the ALJ took the testimony of vocational expert (VE) Chelsea Brown first. Ms. Brown made a record concerning Ms. Smith's employment history as including work as a housekeeper, waitress, nurse assistant, production assembler, gambling cashier, and heavy equipment operator. (AR at 51-52).

Ms. Smith then testified. At the time of hearing she was 46 years old and a high school graduate. (AR at 52). She could read and write and had a driver's license at the time. She was right handed. (*Id.* at 52-53). Ms. Smith did not have health insurance. (*Id*. at 53). She had no special job training. She lived with her son, who worked outside the home. (*Id*. at 53). She had not worked since September 2013. Her last job was a factory job finishing up products on showers, a job she had for three months. Ms. Smith testified she could not keep up with the work, it was long hours with a lot of bending and stooping, and she was in a lot of pain when she got home. (*Id.*) Before the production job, she worked in housekeeping two or three months but quit to try to go to school for massage therapy.  (*Id.* at 54).

Ms. Smith was not able to work between September of 2013 and March of 2014 because she was tired and "out of energy all the time." (AR at 54-55). She got an MRI of her lumbar spine and echocardiogram in early 2015 and started consulting with Dr. Zurich, a heart specialist, about the same time. (*Id.* at 55). She saw Dr. Zurich upon recommendation by Dr. Sing, a heart doctor at Hardin Medical Center who performed a chemical stress test on her hearing in January 2015.

(*Id.* at 56, 58). She started noticing shortness of breath and pain in her chest which she believed were heart related. (*Id.*) Ms. Smith had been a smoker approximately 28 years. (*Id.* at 56-57). With respect to her back pain, Ms. Smith testified it had been significant since between 2002 and 2003. (*Id.* at 58). Lifespan was her primary care physician in 2013 or 2014, although Ms. Smith testified she did not have a regular physician as she could not afford one. (*Id.* at 59).  Ms. Smith estimated she saw a doctor at Lifespan once or twice. (*Id.* at 61). Ms. Smith testified she had an EKG sometime before March of 2014 at Wayne County Hospital because at the time her heart was hurting and she was out of breath. (*Id.*) She did not follow up as she did not have the funds to see anyone for these problems. (*Id.* at 63).

With respect to her mental health issues, Ms. Smith was hospitalized in March 2014 after she had been going to Centerstone since 2013. (AR at 64). Between September 2013 and March 2014, she testified her depression and anxiety affected her so that she could not do anything – she wanted to die and had no money. (*Id.*) She took medication, which was changed after she got out of the hospital, and testified it had helped more. She had not been hospitalized since that time. (*Id.*) She took no prescription pain medication between September 2013 and March 2014. (*Id.* at 65). Ms. Smith testified she took a prescription pain medication when she was working for an excavating company but did not take it after she moved north. (*Id.*) At the time of hearing she was not taking a prescription pain medication and did not have insurance to go to the doctors. (*Id.*) She had been referred to a neurosurgeon by Lifespan but she did not have the money or transportation to get there. (*Id.* at 65-66). Dr. Zurich, the heart specialist, had not been paid at the time of hearing and she was working with St. Thomas to resolve that bill. (*Id.* at 66).

Ms. Smith testified she was short of breath and still smoked, perhaps five to ten cigarettes on a "great" day. (AR at 66). She used inhalers and had been advised by doctors to stop smoking.

(*Id.* at 66-67). Between September 2013 and March 2014 Ms. Smith testified she had chest pain three to four times a week for between seconds and a few minutes. She was prescribed nitroglycerin but had not taken it. (*Id.* at 67).

On examination by her attorney, Ms. Smith testified she was tired all the time and took naps two to five times a day. (AR at 69). When she stopped working in September 2013 she did not take rest periods, but her work was slow and she could not keep up. (*Id.* at 70). When she got home from work she would shower and go to sleep. (*Id.*) Between September 2013 and March 2014 her back hurt every day and she would have to change positions between sitting and standing every 20 or 30 minutes. (*Id.* at 71). When she was working at her last job she could alternate between sitting and standing and estimated she did so once every 20 to 30 minutes. (*Id.*) Ms. Smith testified she had problems with concentration and estimated she could concentrate about twenty minutes at a time. (*Id.* at 72). She had problems with concentration, remembering things and/or following directions on her last job. (*Id.*)

Ms. Smith testified that she could do her own self-care but did not see much sense in doing so if she was not going anywhere. (AR at 72). She could do household chores on her own schedule and took rests. (*Id.*) At her last job in September 2013 she had problems keeping up with the pace. (*Id.* at 73).

The ALJ gave the VE a hypothetical assuming a person limited to light work with occasional postural activities; climbing, balancing, stooping, crouching, kneeling, and crawling; who needed a sit/stand option allowing alternating sitting and standing every 30 minutes; could not be exposed to irritating inhalants or temperature extremes; and who was able to understand, remember, and carry out short and simple instructions and make judgments on simple work related decisions with only occasional public interaction. (AR at 73-74). In response, with respect to past

work, the VE said the only available job would be production assembler. As for unskilled light work, the person could work as a collator operator, a marker, and a mailroom clerk. (*Id.* at 74-75). In response to examination by Ms. Smith's attorney, the VE testified she had placed individuals in Tennessee at a plant where they assembled small parts and had the option to sit or stand as long as they could stay on task. (*Id.* at 75). In response to a second hypothetical by the attorney, adding a person with some degenerative disc disease and arthritis affecting her hands, resulting in a limitation of occasional gripping or grasping, the VE testified "it would significantly erode the light unskilled jobs that would require occasional public contact," so there would be no jobs that person could perform. (*Id.* at 76-78).

## II.    FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Ms. Smith must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant "has a residual functional capacity to do other kinds of work, and that other work

exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952-53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on October 28, 2015 and made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2014.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 25, 2013 through her date last insured of March 31, 2014 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease, chronic obstructive pulmonary disease (COPD), coronary artery disease (CAD), major depressive disorder and panic disorder. (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb, balance, stoop, kneel, crouch, and crawl; requires an option to sit or stand every thirty minutes; and cannot tolerate irritating inhalants or temperature extremes. She can understand, remember and carry out short and simple instructions and make judgments on simple work related decisions and have occasional contact with the public.

6.  Through the date last insured, the claimant was not able to perform any past relevant work (20 CFR 404.1565).

7.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

8.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that

existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

9. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 25, 2013, the alleged onset date, through March 31, 2014, the date last insured (20 CFR 404.1520(g)).

(AR at 32-38).

## III. STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court should not overturn the ALJ's so long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court]

might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556.

## IV.   DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds: (1) that "substantial evidence in the record as a whole does not support the finding" that Ms. Smith is capable of performing the unskilled light work jobs identified by the VE; (2) the ALJ failed to develop a full record regarding Ms. Smith's heart-related impairments; and (3) the ALJ improperly discredited Ms. Smith's subjective complaints of pain. (Pl. Brief [12] at 10-16). In response, the Commissioner argues that (1) the ALJ's Step Five disposition is supported by substantial evidence; (2) the record was sufficient with regard to Ms. Smith's heart-related impairments; and (3) substantial evidence supports the ALJ's credibility findings concerning Ms. Smith's subjective complaints. (Def. Brief [13] at 4-15).

## A.   Unskilled Light Work Jobs

The ALJ found "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that" Ms. Smith could have performed. (AR at 37). This was based on an RFC of light work with the exception

> she can occasionally climb, balance, stoop, kneel, crouch, and crawl; requires an option to sit or stand every thirty minutes; and cannot tolerate irritating inhalants or temperature extremes. She can understand, remember and carry out short and simple instructions and make judgments on simple work related decisions and have occasional contact with the public.

(*Id.* at 34). The VE testified that an individual with such a RFC would be able to perform jobs such as production assembler (past work), collator operator, marker, and mail room clerk, all of which were unskilled light work under the Dictionary of Occupational Titles (DOT). (*Id.* at 73-75). The

VE testified that the DOT did not address a sit/stand option for these jobs, therefore she based her opinion on her experience placing individuals in similar jobs in Tennessee as well as on "the Occupational Outlook Handbook as to how these jobs are performed in today's economy." (*Id.* at 74).

Plaintiff argues that the limitation of sitting/standing every 30 minutes would limit her "to being on her feet for four hours out of an 8 hour workday and being in a seated position for four hours out of an 8 hour workday," neither of which is consistent with light work and "specifically not consistent with the unskilled light work" which the ALJ found Ms. Smith capable of performing. (Pl. Brief [12] at 11). Plaintiff argues the jobs of collator operator, marker, and mail room clerk all "require a good deal of standing or walking" which would be precluded by plaintiff being restricted to sitting four hours in an eight-hour day. (*Id.* at 12). Plaintiff further argues the VE did not testify as to whether she was testifying per the DOT definitions or based on her experience as a VE. (*Id.*) Alternatively, plaintiff urges the Court to award benefits based on SSR 83-12, arguing plaintiff falls in the situation that she cannot perform the sitting required by sedentary work nor the standing required by light work. (*Id.* at 12-13).

In response, defendant argues the RFC is not as restrictive as plaintiff suggests, that the sit/stand option "does not somehow compel Plaintiff to alternate positions every 30 minutes – it merely gives her the option to do so," and that plaintiff omits the word "option" from her argument. (Def. Brief [13] at 5). Alternatively, defendant argues that assuming the RFC limited plaintiff to standing and walking four hours each workday, a "hybrid RFC" was created and SSR 83-12 encourages the ALJ to solicit VE testimony. (*Id.* at 5-6). Defendant cites to the VE's testimony in response to the ALJ's question that "the DOT does not address a sit/stand option. I'm basing my opinion off of my experience placing individuals in these types of jobs, as well as referencing the

Occupational Outlook Handbook as to how these jobs are performed in today's economy" as satisfying that guidance of SSR 83-12.  (*Id.* at 6, citing AR at 74).

> Light work under the regulations

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). When the limiting factors are "Alternate Sitting and Standing," SSR 83-12 advises

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12 (S.S.A.), 1983-1991 Soc.Sec.Rep.Serv. 36, 1983 WL 31253, at *4.

The RFC included this language: "requires an option to sit or stand every thirty minutes." (AR at 34). Plaintiff has characterized this as restricting her to sitting four hours in an eight hour day. She also characterizes the jobs suggested by the VE, collator operator, marker, and mail clerk, as requiring "a good deal of standing or walking." (Pl. Brief [12] at 12). "DOT definitions are 'simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.' . . . Its descriptions are not meant to be read as requirements of every job within a category." *Chismarich v. Berryhill*, No. 4:15CV1575CDP, 2017 WL 476408, at *5 (E.D. Mo. Feb. 6, 2017) (quoting *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007)).

The record demonstrates the ALJ included the stand/sit option in the RFC hypothetical directed to the VE. The record also demonstrates that the VE specifically noted the DOT did not address a sit/stand option and her opinions regarding the viability of these jobs for plaintiff were based on her experience placing individuals in those types of jobs, as well as the Occupational Outlook Handbook regarding how those jobs are performed in today's economy. (AR at 73-74). This is consistent with SSR 83-12 and with the case law cited by plaintiff, *Misner v. Chater*, 79 F.3d 745, 746 (8th Cir. 1996)(VE testified relevant jobs allowed for alternating positions, consistent with the claimant's RFC). There is substantial evidence in the record to support the ALJ's finding concerning plaintiff's ability to perform light unskilled work identified by the VE.

B.    <u>Heart-Related Impairments</u>

Plaintiff next argues that the Social Security Administration/ALJ should have ordered consultative examinations of Ms. Smith's heart issues prior to expiration of her insured status in March 2014. Defendant responds the record was sufficient to permit the ALJ to draw a conclusion about whether plaintiff was disabled as of March 31, 2014.

The ALJ found that Ms. Smith had

> a history of coronary artery disease (CAD) with mild mitral regurgitation but did not see a cardiologist from 2008 through the date last insured. (Exhibits 2F, 4F & 8F). Her cardiovascular exam during the period in question was within normal limits. (Exhibit 2F). This suggests that the claimant's coronary artery disease (CAD) was not as severe as she alleges during the period in question.

(AR at 35). The exhibits in 4F actually relate to Ms. Smith's mental health treatment. The exhibits in 8F are medical tests conducted in January 2015, some nine months after expiration of Ms. Smith's insured status. Although the ALJ referenced Ms. Smith's history from 2008, he was unable to review medical records from that time as counsel did not submit them until February 12, 2016, to the Appeals Council. (AR 81-266). Thus, the only medical evidence before the ALJ concerning Ms. Smith's heart disease which falls within the relevant disability window of September 25, 2013 to March 31, 2014, is the examination and report of Dr. Gary McBride in Exhibit 2F. (AR at 450-458). Dr. McBride conducted an "All Systems Examination" at the request of the state agency. Ms. Smith reported occasional chest pain, tachycardia and shortness of breath, which were made better by rest and worsened by housework, walking and stress. (*Id.* at 450). She last saw a cardiologist in 2008 and her primary care physician in 2011. (*Id.*) She complained of chest pain 3-4 times a week with radiation into her right arm, "associated with dizziness, tachycardia, dyspnea, shortness of breath, and headache," occurring with exertion and stress. (*Id.*) The pain resolved after resting 30-60 minutes or on its own. (*Id.*) She did not report any activities were affected by her heart condition. (*Id.* at 451). On cardiovascular examination, Dr. McBride notes Ms. Smith's heart had "[r]egular rhythm without murmurs, gallops, or rubs. No signs of vascular congestion . . . ." (*Id.* at 453). Dr. McBride made no diagnosis or medical capacity assessment concerning Ms. Smith's heart condition. His only recommendation was for psychiatric evaluation for her allegations of

depression and anxiety. (*Id.* at 457). He had no medical records to review in conjunction with his examination.[2] (*Id.*)

> While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue,* 627 F.3d 316, 320 (8th Cir.2010) (quotation, alteration, and citation omitted).

*Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011). The ALJ did have medical records concerning Ms. Smith's heart condition which occurred after March 31, 2014. While it is true "[e]vidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded,'" *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)(quoting *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998)), the records for the relevant time period provided sufficient medical evidence (albeit not in Ms. Smith's favor) for the ALJ to make a determination of disability. Based on Dr. McBride's evaluation, there was no basis in the record for the ALJ or the Social Security Administration to consider sending Ms. Smith for a consultative examination prior to expiration of her insured status period. No error was committed in failing to send Ms. Smith for a consultative heart examination.

C.     Credibility Findings

Finally, plaintiff argues the ALJ improperly discredited Ms. Smith's complaints of pain, making only a "boiler-plate blanket statement" and giving no specifics why he found her statements lacked credibility. (Pl. Brief [12] at 15-16). Defendant responds the ALJ did "articulate specific reasons" and is not "required to engage in a line-by-line of each individual subject allegation." (Def. Brief [13] at 11).

---

[2] In her brief, plaintiff references the existence of a left ventricular ejection fraction of 40-45% at the time of Dr. McBride's evaluation (Pl. Brief [12] at 14); however, that record was from 2008 (AR at 195) and was not referenced by Dr. McBride, who had no medical records to review.

In considering the credibility of a claimant's subjective allegations of pain, an ALJ must apply the factors in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Wildman,* 596 F.3d at 968; SSR 96-7p. Those factors include:

> (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.

*Wildman*, 596 F.3d at 968 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)). "Other factors include the claimant's 'relevant work history and the absence of objective medical evidence to support the complaints.'" *Id.* (quoting *Gowell*, 242 F.3d at 796). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). So long "'as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so,'" courts are to defer to the ALJ's credibility finding. *Wildman*, 596 F.3d at 968 (quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)(internal quotation omitted)); *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

In finding that Ms. Smith's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible," the ALJ articulated several different reasons for his findings. First, while Ms. Smith had a history of coronary artery disease, she had not seen a cardiologist from 2008 to the date last insured, March 31, 2014. (AR at 35). Second, with respect to her documented chronic obstructive pulmonary disease, again plaintiff had not received any treatment and her lung exam by Dr. McBride was within normal limits. (*Id.*, citing AR at 453). Finally, Ms. Smith did have "mild degenerative disc disease at L3-4 vertebral level," however, in spite of her report of radiating low back pain she had negative straight leg raises bilaterally and a normal station but antalgic gait. (*Id.*) The ALJ noted she had not been hospitalized for her back pain, had not seen an orthopedic surgeon or neurosurgeon to evaluate her back, and the records

before him at the time of hearing did not indicate she had epidural injections or physical therapy.[3] The ALJ did not have information that Ms. Smith had seen a pain specialist or used a TENS unit and she did not use an assistive device to walk or wear a brace. Based on these factors, the ALJ concluded "the level of pain is not as severe as alleged." (*Id.* at 35).

Other factors the ALJ relied on as detracting from the credibility of her allegations included Ms. Smith's report of her daily activities, which included doing house chores, occasionally mowing the lawn, and playing computer games. (AR at 36).

Under *Polaski* and given the limited records provided to him, the ALJ sufficiently articulated his reasons for giving only partial credit to Ms. Smith's allegations of pain.

## V.    REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that the ALJ's determination that Ms. Smith was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the defendant and against plaintiff dismissing the Complaint.

IT IS ORDERED that the parties have until **January 12, 2018** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis

---

[3] The Court notes that in records counsel provided to the Appeals Council in February 2016 after the ALJ had made his decision, there is evidence Ms. Smith had epidural injections and physical therapy between 2005 and 2007; however, those records were not provided to the ALJ. (AR 81-266).

for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated December 29, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge